IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: MARTIN AND GRETCHEN YOUNG, Debtors     No. 5:15-bk-71143
Chapter 7

MARTIN L. YOUNG and
GRETCHEN J. YOUNG                          PLAINTIFFS

v.                     5:15-ap-7091

U.S. DEPARTMENT OF EDUCATION         DEFENDANT

## ORDER AND OPINION

The debtors, Gretchen and Martin Young, filed their chapter 7 case on April 28, 2015. They received a discharge on August 4, 2015. On September 4, 2015, the debtors filed this adversary proceeding against the United States Department of Education [DOE], seeking a determination that their student loans are discharged pursuant to 11 U.S.C. § 523(a)(8). The Court held a trial on June 23, 2016. Forrest L. Stolzer appeared on behalf of the debtors. Deborah J. Groom appeared for DOE. At the conclusion of the trial, the Court took the matter under advisement. For the reasons stated below, the Court finds that the debtors' student loans are nondischargeable.

## Background[1]

Gretchen and Martin Young were married in 2003. Gretchen, now thirty-six, received a bachelor's degree in mathematics in 2006 and a master's degree in teaching in the fall of 2007, both from the University of Arkansas at Fayetteville. To fund her education, Gretchen obtained multiple student loans that were subsequently consolidated and

---

[1] Unless otherwise stated, the facts in this section were taken from the debtors' testimony on June 23 and were not disputed by DOE.

currently total $99,042.13.[2]  After Gretchen completed her degrees, the debtors continued to reside in Fayetteville.  Martin worked at Superior Nissan as a mechanic and supported the couple while Gretchen applied for available math teacher positions in Northwest Arkansas.  Gretchen estimates that she sent out approximately 20 resumes in 2008 but received no calls as a result.  In March 2008, the debtors' first child was born.  In both 2009 and 2010, Gretchen expanded her job search from Northwest Arkansas to the entire state, sending resumes to each district regardless of whether the district had an available position.  Her efforts in 2009 and 2010 resulted in one interview and no job offers. Gretchen testified that she made some payments on her student loans after graduating with her master's degree but stopped paying on the loans in 2010 because the "extra" money for the payments was not available.[3]  She recalls that her student loan payments totaled approximately $500 per month.  Martin incurred $21,359.03 in student loan debt when he attended the University of Monticello in 2003 and 2004 to pursue a criminal justice degree.[4]  He opted not to finish the program because he believed that he would make less money in law enforcement than he could earn as a mechanic.  Martin does not remember making any payments on his student loans but it appears that he or Gretchen paid approximately $1644.53 on his loans before discontinuing his student loan payments

---

[2]  Gretchen's student loan debt is comprised of the following two loans accruing interest at 6%: (1) the Direct Consolidation Loan disbursed on August 22, 2014, in the amount of $44,515.01; and (2) the Direct Consolidation Loan disbursed on August 22, 2014, in the amount of $45,999.77.

[3]  The Certificate of Indebtedness introduced at trial by DOE as Exhibit 2 reflects that no payments have been credited to Gretchen's two consolidation loans executed on July 11, 2014.  It is unclear whether DOE's records contradict Gretchen's testimony that she made payments on her student loans prior to consolidating them.

[4]  Martin's student loan debt is comprised of the following four loans at the interest rates specified: (1) the Direct Consolidation Loan disbursed on April 20, 2012, in the amount of $8678.55 at 5.125% interest; (2) the Direct Consolidation Loan disbursed on April 20, 2012, in the amount of $4162.77 at 5.125% interest; (3) the Direct Stafford Loan disbursed on June 6, 2011, in the amount of $4500 at 4.5% interest; and (4) the Direct Stafford Loan disbursed on June 6, 2011, in the amount of $1466 at 6.8% interest.

along with hers.  Gretchen estimates that Martin's monthly payment was around $100 per month.  Once the debtors stopped paying their loans, they never resumed.  The debtors did not inquire about obtaining deferrals or participating in income based repayment plans.  Both debtors are currently in default on their student loan obligations.

In 2011, both Gretchen and Martin found teaching jobs in Dumas, a town less than an hour away from Martin's family in Monticello.  Martin taught an automotive class making $31,700 per year with benefits and Gretchen taught high school students how to successfully interview for jobs after graduation.  Gretchen's class covered topics such as resume writing, interviewing skills, and dressing appropriately for interviews.  Gretchen earned $31,000 per year with benefits.  Both Gretchen and Martin remained in their positions with the Dumas school district in 2012.  In 2013, the debtors quit their jobs in Dumas and moved to Elkins, near Gretchen's family.  The debtors left Dumas because they felt that their child, who would later be diagnosed with Asberger's Syndrome and Attention Deficit Hyperactivity Disorder, had been treated improperly at his preschool and they believed that he would receive more appropriate treatment and a better education in Northwest Arkansas.

Once in Northwest Arkansas, the debtors borrowed $33,500 from Gretchen's grandfather's trust to buy an 880-square-foot home in Elkins that needs an estimated $50,000 in repairs.  The debtors currently owe $28,000 to the trust and their monthly mortgage payment is $300.  Occasionally, Gretchen cleans rent houses owned by the trust in lieu of making the mortgage payment.  In 2013, Gretchen applied for teaching positions in the area, receiving one interview but no job offers.  Upon the birth of the debtors' second child in 2014, Gretchen discontinued her attempts to find a job because she felt that the cost of childcare would offset her earnings.  After the debtors moved back to Northwest Arkansas, Martin returned to his job at Superior Nissan in Fayetteville.

The amended Schedule I filed by the debtors on June 21, 2016, indicates that Martin grosses $41,500 per year. After deductions to his check–including his contribution to a 401(k) retirement account–Martin estimates that he nets $2537 per month. Schedule I reflects that the debtors' oldest son receives SSI benefits of $642 per month. In February 2016, the debtors received a federal tax refund for the year ending December 31, 2015, in the amount of $6824.[5] They used the refund, in part, to buy a vehicle that Martin could fix up and to pay off Gretchen's vehicle that had required a monthly payment of $427.51. Pro-rated over the course of one year, the debtors' most recent federal tax refund amounts to an extra $568 per month. With their son's SSI benefits, their pro-rated tax refund, and Martin's earnings, the debtors estimate that their current net monthly income is $3747.[6]

The debtors' filed their latest amended Schedule J on June 21, 2016, itemizing monthly expenses totaling $3857 as follows:

| Home Ownership Expense | $300 |
|---|---|
| Real Estate Taxes | $10 |
| Homeowner's Insurance | $56 |
| Electricity/Gas | $175 |
| Water/Sewer | $60 |
| Home repairs | $416 |
| Food/Housekeeping | $900 |
| Childcare/Education | $20 |
| Clothing/Laundry | $150 |
| Personal Care | $40 |
| Medical/Dental Expenses | $40 |
| Transportation | $350 |
| Entertainment/Recreation | $120 |
| Auto Insurance | $125 |

---

[5] The debtors received substantial federal tax refunds five of the past six years: for 2010, the debtors' federal tax refund was $3758; for 2011, it was $4608; for 2013, it was $2346; for 2014, it was $9140, and, as stated above, the debtors' refund for 2015 was $6824. None of the refunds were used to reduce the debtors' student loan debt.

[6] Gretchen testified that the debtors' net income fluctuates because their son's SSI benefits are normally paid only ten months out of the year due to Martin earning too much during the other two months. If this fluctuation is taken into account, the debtors' net monthly income is $3640.

| | |
|---|---|
| Help for sister | $150 |
| Snap-on tools | $400 |
| Post-petition medical bills | $100 |
| Cats (4) | $40 |
| Diapers/Wipes | $50 |
| Cell Phone | $75 |
| Telephone/Cable/Internet | $180 |
| "Aspirational" fund | $100 |

At trial, the debtors explained some of the enumerated expenses while their bank statements shed light on other expenses not reflected in their schedules.  The debtors currently give $150 to $200 each month to help support Gretchen's sister who has breast cancer and is unable to work.  Gretchen testified that other members of Gretchen's family also give monthly financial assistance to her sister.  The debtors sometimes buy Gretchen's sister groceries while shopping for their own, sometimes pay a utility bill for her, and sometimes give her money.  The debtors do not expect their financial contributions to Gretchen's sister to continue indefinitely.  The debtors' cable bill of $180 per month includes internet and a home telephone.  Although Schedule J indicates that the debtors spend $175 per month on electricity and gas, their bank statements reflect that they actually spend an average of $127 each month for those utilities.  The debtors arrived at the figure of $416 per month for home repairs by spreading out $50,000 in estimated repairs over the course of ten years (or 120 months).  The debtors testified that they need to make significant repairs in order for the home to be comfortable and safe, including repainting and installing central heat and air, new carpet, a new roof, and new windows.[7]  The debtors estimate that they spend $900 per month on food and housekeeping supplies.  The debtors' bank statements reflect that they spend $862 per month at various grocery stores and an additional $206 per month on restaurant meals and fast food.

---

[7]  At trial, the debtors introduced an estimate of $8316.80 from Carpet One for new flooring and an estimate of $3262 from Window World of the Ozarks for window replacement, for a total documented repair estimate of $11,578.80.  Pl. Ex. 8.  The remaining $38,421.20 of the debtors' $50,000 estimate is presumably the debtors' best guess as to the cost of the additional home repairs they wish to make.

5

Although not reflected on amended Schedule J, Gretchen testified that she spends approximately $80 per month on cigarettes. Both debtors spend some portion of the family's income on alcoholic beverages. Gretchen explained that their "aspirational" fund of $100 is the amount that they hope to save each month but are not currently saving. Also not explained on amended Schedule J are the frequent cash withdrawals reflected on the debtors' bank statements. The withdrawals are generally several hundred dollars each–up to $600–and occur at least monthly, usually more often. Based upon the Court's analysis of the bank statements introduced at trial, the debtors withdraw an average of $535 per month in cash,[8] consistently generating subsequent overdraft fees. Gretchen testified that she likes to make sure that Martin has $20 in cash in his wallet in case the debit card will not work due to overdraft charges. She also testified that although she normally writes a check for the mortgage payment, occasionally she pays the debtors' $300 mortgage payment in cash.

The debtors are in reasonably good health at the present time. However, Martin, now forty-eight, has carpal tunnel syndrome, back problems, and bone spurs and says that he expects to be disabled in the future because his doctor told him that he would develop diabetes if he did not exercise and change his diet, which he has not done. Gretchen has tendinitis in her Achilles tendon which prevents her from standing comfortably for long periods of time but is otherwise healthy. Gretchen intends to return to work full-time in two years, when the debtors' youngest child turns four. Although the debtors' oldest child has behavioral and social problems, he is covered on Martin's health insurance and Gretchen testified that she expects him to be able to live and function on his own when he reaches adulthood.

If the debtors were required to pay their full student loan payments, Gretchen's payment would be approximately $500 per month and according to Gretchen's recollection,

---

[8] If the Court includes in its calculation one unusually large cash withdrawal of $4500 on February 8, 2016, the debtors' monthly cash withdrawals average $815.

Martin's would be $100 per month.[9]  At trial, however,  counsel for DOE advised the debtors that they are eligible for an income based repayment program that would require the debtors to make a single payment of $57.18 per month for both debtors' student loans.  Gretchen, who handles the family's finances, admitted that they could "probably" find $57.18 per month to make the payment.  DOE also advised the debtors that should Martin become disabled, there are federal programs that would allow him to discharge his student loan debt.

## Findings of Fact and Conclusions of Law

Section 523(a)(8) provides that student loans are not discharged in bankruptcy "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents."  To obtain a discharge of student loan debt, a debtor must prove by a preponderance of the evidence that repayment constitutes an undue hardship.  *Parker v. Gen. Revenue Corp.* (*In re Parker*), 328 B.R. 548, 552 (B.A.P. 8th Cir. 2005).  Proving undue hardship requires more than a demonstration that it would be difficult for the debtor to repay the student loans.  *Id.* at 553.  The Eighth Circuit characterizes the debtor's burden under § 523(a)(8) as "rigorous."  *Educ. Credit Mgmt. Corp. v. Jesperson* (*In re Jesperson*), 571 F.3d 775, 779 (8th Cir. 2009).

Because § 523(a)(8) does not define undue hardship, "courts have devised their own methods of determining whether an undue hardship exists."  *Conway v. Nat'l Collegiate Trust* (*In re Conway*), 495 B.R. 416, 419 (B.A.P. 8th Cir. 2013).  The Eighth Circuit employs a totality of the circumstances test that requires courts to evaluate a debtor's "past, present, and reasonably reliable future financial resources, the debtor's reasonable and necessary living expenses, and 'any other relevant facts and circumstances.'"  *In re Jesperson,* 571 F.3d at 779 (quoting *Long v. Educ. Credit Mgmt. Corp.* (*In re Long*), 322 F.3d 549, 554 (8th Cir. 2003)).  "[I]f the debtor's reasonable future financial resources

---

[9]  Based upon a bill introduced as Plaintiff's Exhibit 6, it appears that Martin's monthly payment would actually be $237.81.

7

will sufficiently cover payment of the student loan debt–while still allowing for a minimal standard of living–then the debt should not be discharged." *In re Long*, 322 F.3d at 554-55. Generally, a minimal standard of living includes "the ability to pay for food, shelter, utilities, personal hygiene, clothing, medical and dental expenses, and recreation." *Johnson v. Sallie Mae, Inc.* (*In re Johnson*), No. 5:13-ap-7010, 5:13-ap-7011, 2014 WL 7011097, at *3 (Bankr. W.D. Ark. Apr. 30, 2014) (citing *Shadwick v. U.S. Dept. of Educ. et. al.* (*In re Shadwick*), 341 B.R. 6, 11 (Bankr. W.D. Mo. 2006)). Accordingly, the Court will evaluate the totality of the circumstances to determine whether the debtors have the financial resources to maintain a minimal standard of living while also paying their student loan debts.

## I.      Past, Present, and Future Financial Resources

When the debtors were both employed in Dumas, they earned a combined annual income of $62,700 per year with benefits, with Gretchen making $31,000 and Martin earning $31,700. They chose to leave their jobs in Dumas to move to Northwest Arkansas, where Martin has remained consistently employed. Currently, Martin makes $41,500 per year–almost $10,000 more per year than he earned as a teacher in Dumas. Although Martin testified that he expects to be disabled in the future because he will become diabetic, it is by no means a certainty that he will develop diabetes. In fact, Martin testified that his doctor advised him of lifestyle changes that he could implement to prevent the development of the disease. Because the Court will not speculate regarding a potential disability arising from a diagnosis that has not yet been made–and is apparently still preventable–the Court finds no impediment to Martin's continued employment in the foreseeable future. Gretchen has not looked for a job since the debtors' second child was born in 2014. The debtors' current plan is for Gretchen to stay at home until their youngest child, now two years old, reaches the age of four. It is clear that the debtors' financial situation will improve in two years when Gretchen, who is well educated with both an undergraduate degree and a master's degree, returns to work. Gretchen has successfully found employment in the past–even teaching a class about how to do that very thing–and the Court has no evidence to suggest that Gretchen will not be able to

8

secure reasonably similar employment to the position that she held in Dumas with benefits and an annual salary of $31,000.  When both debtors are employed in two years, the Court finds that the debtors will have the resources to pay their outstanding student loan debt.  In the interim, the Court's adjustments to the debtors' monthly expenses, explained below in Section II, will allow the debtors to make the $57.18 per month payment offered by the DOE under the income contingent repayment program.

## II.        Reasonable and Necessary Living Expenses

In order for expenses to be reasonable and necessary in the context of a § 523(a)(8) analysis, they must be "modest and commensurate with the debtor's resources."  *In re Jesperson*, 571 F.3d at 780 (citation omitted).  "While the total amount of monthly expenses must be reasonable, courts also scrutinize specific expenses to determine whether those expenses are unnecessary and excessive to the extent that funds can be reallocated to pay for the student loans the debtor seeks to discharge."  *Johnson v. Sallie Mae, Inc.* (*In re Johnson*), No. 5:13-ap-7010, 5:13-ap-7011, 2014 WL 7011097, at *4 (Bankr. W.D. Ark. Apr. 30, 2014).  After reviewing the debtors' expenses as represented in amended Schedule J and supplemented by the debtors' testimony and bank statements, the Court finds that some of the debtors' expenditures are overstated, unnecessary, or excessive and could be reallocated toward the $57.18 monthly payment offered by the DOE under the income contingent repayment program.   The debtors' most recently amended Schedule J currently reflects a monthly deficit of $110.  For the reasons explained below, the Court finds that the following adjustments to the debtors' budget are warranted:

### A.        Home Telephone

Because the debtors each have a cell phone and there is no evidence before the Court to suggest that the debtors also need a telephone line at home, the Court finds that the expense of a home telephone is unnecessary.  By eliminating their home telephone, the debtors' monthly expenses could be lowered by approximately $35, reducing their monthly shortfall of $110 to $75.

9

### B.      Car Insurance

The debtors' amended Schedule J reflects that $125 per month is allocated to car
insurance premiums.  The debtors' bank statements show that the premium is actually
$117 per month, adding another $8 to the debtors' budget and bringing their monthly
deficit to $67.

### C.      Electricity and Gas

The debtors estimate on amended Schedule J that they spend $175 per month on
electricity and gas.  However, their bank statements reflect that they actually spend an
average of  $119 per month on these utilities.  Accordingly, the Court adds $56 to the
debtors' budget, taking their deficit from $67 each month to $11.

### D.      Transportation

The debtors own three vehicles: a 2005 Nissan Altima that Martin drives; a 2011 Toyota
Camry that Gretchen drives; and a 1995 truck. The truck currently runs, but according to
Gretchen, it breaks down frequently and neither debtor drives it regularly.  The Camry is
in good working condition and was recently paid off with the debtors' most recent tax
refund.  After the debtors bought the Altima for $350, Martin repaired it and currently
drives it approximately thirty miles per work day, round trip.  When the debtors filed
their original Schedule J with their petition on April 28, 2015, they stated their monthly
transportation expenses as $300.  When the debtors filed an amended Schedule J on
January 5, 2016, they left the $300 transportation expense intact.

The Court's review of the debtors' bank statements indicates that the debtors actually
spent an average of $267 per month on transportation costs during 2015.[10]  When the
debtors filed their most recently amended Schedule J on June 21, 2016–two days prior to
trial–they increased their estimated monthly transportation expenses to $350.  Based

---

[10]  Despite Gretchen's testimony that she sometimes buys fast food at
convenience stores, the Court attributed all convenience store purchases to gasoline for
purposes of this calculation.

10

upon the Court's review of the debtors' bank statements to date for 2016, the debtors' expenses have decreased in this category–not increased–and now average $185 per month for gasoline and other vehicle related expenses.[11]  The Court acknowledges that the debtors' vehicles may require maintenance from time to time; however, Martin is a mechanic and–despite his testimony that he does not enjoy repairing his own vehicles when he is off work–he is qualified and able to perform the maintenance and repairs on the debtors' vehicles.  To more closely reflect their actual transportation expenditures while accounting for fluctuations in gasoline prices and unexpected costs, the Court reduces the debtors' transportation budget from $350 to $250, adding another $100 to the debtors' budget.  This adjustment results in the debtors' budget changing from a deficit of $11 per month to a surplus of $89 per month.

### E.    "Aspirational" fund

Gretchen testified that the $100 "aspirational" fund appearing on amended Schedule J is the amount of money that she would like to save each month.  However, Gretchen testified that she has not been able to save this money, using it for expenses instead.  Accordingly, the Court adds $100 back into the debtors' monthly budget.[12]  This adjustment results in a budgetary surplus of $189 per month.

### F.    Recreation

When the debtors filed their original schedules on April 28, 2015, the listed their net income as $2926.49 and their expenses as $2588.51, allocating no funds toward recreation and leaving a monthly surplus of $337.98.  On September 4, 2015–the same day the debtors filed this adversary proceeding–they filed an amended Schedule J,

---

[11]  The Court takes judicial notice that gasoline prices in Arkansas currently average $1.925 per gallon.  This time last year, gasoline in Arkansas cost an average of $2.417 per gallon. The drop in gasoline prices over the past year has no doubt contributed to the the debtors' lowered transportation costs.

[12]  The Court notes that even with the elimination of the debtors' "aspirational" fund, they are not entirely without savings because Martin has a 401(k) account.

leaving their income the same as previously scheduled but increasing their total expenses from $2588.51 to $3183.51, and scheduling a recreation expense of $75 per month.  On January 6, 2016, the debtors filed amended Schedules I and J, increasing their monthly income from $2926.49 to $3088.49 and increasing their monthly expenses from $3183.51 to $3653.51, including an additional $25 per month for recreation, bringing the debtors' monthly expense for recreation to $100.  On June 21, 2016, the debtors again amended Schedules I and J, this time increasing their monthly income from $3088.49 to $3747 and–despite no longer having a car payment of $421.57–increasing their total monthly expenses from $3653.51 to $3857, adding another $20 for recreation, bringing their monthly recreation expenses to $120.  The Court finds that as the debtors' income has increased, so has their recreational spending.

While a minimal standard of living includes recreation, the debtors' recreational expenditures have steadily increased during the fourteen months between the filing of their bankruptcy petition and the trial of this adversary proceeding.  Gretchen testified that the debtors' monthly recreation expense of $120 includes Netflix, videos, and books purchased for their oldest child.  While it is commendable that the debtors encourage their child to read, they could reduce the amount of money they are spending on books by using the library to supply at least a portion of his reading material.  Additionally, based on the debtors' bank statements, they have not one but two Netflix subscriptions totaling $22.08 per month and they also frequently rent Redbox and Instaflix movies.  The Court finds that the debtors' total monthly recreation expense of $120 is excessive for a family of four.  *See Standfuss v. U.S. Dept. of Ed.* (*In re Standfuss*), 245 B.R. 356, 360 (Bankr. E.D. Mo. 2000) (finding that a monthly recreation expense of $100 was excessive for a family of five despite the fact that the family had already discontinued cable television and telephone service in an attempt to live frugally); *see also VerMaas v. Student Loans of North Dakota et al.* (*In re VerMaas*), 302 B.R. 650, 659 (Bankr. D. Neb. 2003) (finding that $120 monthly recreation expense for family of four should be reduced to $60 per month).  Accordingly, the Court returns the debtors' monthly recreation expense to $75 pursuant to the Schedule J filed by the debtors on September 4, 2015, adding

another $45 to the debtors' budget and bringing their monthly surplus to $234.[13]

### G.    Food and Housekeeping Supplies

The debtors estimate on their amended Schedule J that they spend $900 per month on food and housekeeping supplies.[14]  Gretchen testified that they spend $800 on food and $100 on housekeeping supplies.  The Court finds that $900 per month for food and housekeeping supplies is not patently unreasonable for a family of four.  However, the debtors' bank statements indicate that their food and housekeeping supply expenditures are actually $168 higher than stated on amended Schedule J–totaling $1068 per month instead of $900.  The debtors' bank statements reflect that the debtors spend roughly $862 per month at various discount and grocery stores on food and housekeeping supplies.[15]  However, in addition to their grocery store expenditures, the debtors spend $206 per month for meals at fast food chains and other restaurants.[16]  While the Court acknowledges the need to occasionally rely on the convenience of fast food or other restaurant meals, spending $206 per month to eat out is an excessive expenditure in the context of a § 523(a)(8) analysis.  *See In re Johnson*, 2014 WL 7011097, at *5. (citing *Gibson v. ECMC & College Assist* (*In re Gibson*) 428 B.R. 385, 390 (Bankr. W.D. Mich. 2010); *Southard v. Educ. Credit Mgmt. Corp.* (*In re Southard*), 337 B.R. 416, 420-21 (Bankr. M.D. Fla. 2006)).  At trial, the Court was presented with no compelling justification for the debtors' many restaurant purchases.  In fact, the evidence suggests

---

[13]  If the irregular SSI payment described in footnote 6 is considered, the debtors' monthly surplus is reduced to $127–a figure still in excess of the $57.18 payment required of the debtors under the income contingent repayment plan offered by DOE.

[14]  The debtors' stated in their original Schedule J filed on April 28, 2015, that they spent $700 on food and housekeeping supplies.  No explanation was given at trial for why this expense has increased by $200.

[15]  Fuel, drugstore, and clothing purchases were not included in this calculation.

[16]  The Court's estimate of $206 per month for fast food and restaurant expenditures is low because the Court did not consider in its calculation the frequent debits at Casey's General Store (a gas station and convenience store) because Gretchen testified that she buys both pizza and gasoline at Casey's.

that the debtors' frequent meals out are a convenience rather than a necessity.  When the debtors' attorney asked Martin why he eats out so often–many days purchasing both breakfast and lunch away from home–Martin merely replied that he "[had] to eat" and then agreed with his attorney that eating out afforded him the opportunity to enjoy a better air-conditioned, less crowded environment during his lunch break.  However, there is no evidence to suggest that Martin could not eat breakfast at home before leaving for work or take his lunch to work on occasion rather than eating out for both meals every day of his work week.  Gretchen testified that the family eats out regularly because she does not always feel like cooking.  Although the Court finds that the debtors could–and should–reduce their actual food and housekeeping supply expenditures to correspond with the $900 budgeted on amended Schedule J, the Court finds that the budgeted amount is not unreasonable and makes no adjustment to this category.[17]

### H.    Cash Withdrawals

Disregarding one exceptionally large cash withdrawal of $4500 on February 8, 2016, the debtors withdraw an average of $535 in cash each month.  The evidence as to what the cash is used for each month is scant.  Gretchen testified that she sometimes gives her sister money.  Because the debtors have scheduled monthly support to Gretchen's sister in the amount of $150, the Court will deduct that amount from the $535 in monthly cash withdrawals.  Gretchen also testified that Martin keeps $20 in cash in his wallet so that he has money for lunch if the debtors' checking account is overdrawn and their debit card will not work.  However, the Court has no evidence regarding how many times per month he replenishes this $20 and therefore, the Court cannot consider this as an explanation of where part of the cash goes each month.  Finally, Gretchen testified that although she normally writes a check for the debtors' mortgage payment, she occasionally uses cash for the payment.  Based upon the Court's review of the sixteen complete bank statements

---

[17]  The Court acknowledges that the debtors sometimes buy food for Gretchen's sister with their grocery store purchases.  However, the Court included the debtors' financial contribution to Gretchen's sister as part of their monthly cash expenses in section H and it would be redundant to consider it in this section as well.

introduced at trial,[18] the debtors paid their mortgage by check eight out of sixteen times. However, because Gretchen testified that she sometimes cleans houses owned by the trust instead of paying the mortgage, the lack of a cleared check appearing on a particular bank statement does not necessarily mean that the debtors paid their mortgage with cash for that month.  Nevertheless, if the Court deducts the debtors' monthly support to Gretchen's sister of $150 and gives the debtors credit for paying their $300 mortgage with cash eight times over sixteen months (resulting in a total of $2400 pro-rated over sixteen months for an average monthly cash expenditure of $150), then $300 of the $535 withdrawn in cash each month is accounted for, leaving $235 undocumented and unexplained.

However, despite the unexplained cash withdrawals, the Court makes no adjustment to the debtors' budget for the following reason.  The debtors are not currently spending the budgeted $416 per month on the repairs that need to be made in order for their home to be safe and reasonably comfortable.  When the unexplained $235 in cash is added to the $168 that the debtors overspend each month on food and housekeeping supplies, the total of $403 is roughly equivalent to the amount that the debtors budgeted for home repairs on Schedule J.  Because the Court believes that the home repairs are necessary, it does not adjust the debtors' budget despite their current misallocation of these funds.

## III.    Other Facts and Circumstances

In undertaking an undue hardship analysis, courts in the Eighth Circuit must consider all relevant facts and circumstances in addition to reviewing the debtor's current and future financial resources and expenses.  *In re Jesperson*, 571 F.3d at 784.  Additional circumstances considered in the determination of undue hardship include, but are not limited to:

(1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith

---

[18]  The Court disregarded the duplicate copy of the statement dated February 15, 2016, and the partial statement dated June 7, 2016.

15

> effort to negotiate a deferment or forbearance of payment; (3) whether the
> hardship will be long-term; (4) whether the debtor has made payments on
> the student loan; (5) whether there is permanent or long-term disability of
> the debtor; (6) the ability of the debtor to obtain gainful employment in
> the area of study; (7) whether the debtor has made a good faith effort to
> maximize income and minimize expenses; (8) whether the dominant
> purpose of the bankruptcy petition was to discharge the student loan; and
> (9) the ratio of student loan debt to total indebtedness.

*Id.* (quoting *McLaughlin v. U.S. Funds* (*In re McLaughlin*), 359 B.R. 746, 750 (Bankr.
W.D. Mo. 2007)).  The Court will briefly address additional factors that it finds
applicable in this case.  First, with the budget adjustments discussed above, the debtors
have the capacity to make the $57.18 per month payment required by the income
contingent repayment program.  Second, the debtors have not made a good faith effort to
negotiate a deferment or forbearance of their student loan payments.  Third, the hardship
imposed by the debtors' decision for Gretchen to stay home until their youngest child
turns four is not long-term.  Gretchen will return to work in two years, dramatically
improving the debtors' financial situation.  Additionally, the strain on the debtors' budget
caused by helping Gretchen's ill sister will not continue indefinitely.[19]  Fourth, although
the debtors made a few payments on their loans several years ago, they stopped paying
the loans in 2010 and did not resume the payments in 2011 when both debtors were
employed.  Similarly, they have never used a single dollar of their historically substantial
tax refunds to reduce their student loan debt.  Fifth, the debtors are not mentally or
physically disabled.  In fact, except for some aches and pains–and, in Martin's case, the
*possibility* of developing diabetes–they are both in good overall health.  As a result,
Martin and Gretchen, at forty-eight and thirty-six years old, respectively, have many
years of employment ahead of them.  Sixth, Gretchen has previously been employed in
her area of study, utilizing her master's degree in education to teach high school in

---

[19]  Although it is admirable that the debtors help Gretchen's sister financially,
other family members also lend support and the debtors' financial help to Gretchen's
sister does not supersede their obligation to repay their student loans.

16

Dumas.[20]  There is no evidence that she will not be successful in finding employment in her area of study when she chooses to return to work.

Finally, although the debtors correctly point out that they spend less on housing than the average family of four, they have a duty to minimize their expenses in the context of a § 523(a)(8) analysis and have made no discernible effort to lower other monthly costs. *See In re Standfuss*, 245 B.R. at 360 (despite the bankruptcy court's finding that the debtors lived frugally and had attempted to cut expenses, the court reduced the debtors' budgeted expenses further).  For example, the debtors have made no attempt to avoid monthly overdraft charges averaging $56.  To the contrary, they appear to *plan* for their bank account to have insufficient funds and the resulting overdraft charges each month based upon Gretchen's testimony that Martin needs to have cash in his wallet for instances when the debit card is unusable due to overdrafts.  However, if the debtors simply stopped making such large cash withdrawals, they would not incur the overdraft charges and would have an additional $56 per month at their disposal–almost enough to make the $57.18 payment under the income contingent repayment program without making a single additional change to their spending habits.  Additionally, Gretchen testified that she hopes to quit smoking but there is no evidence that she has ever attempted to do so.  If she stopped smoking, the debtors would have an additional $80 per month to pay toward their student loan debts.  Similarly, while it is impossible for the Court to discern how much of the debtors' total income is spent on alcohol each month due to its availability at grocery and convenience stores, several liquor store purchases are evident on the debtors' bank statements and constitute an expense that could be minimized.  For all of these reasons, the Court finds that despite their modest housing costs, the debtors have not minimized their expenses.  The Court also finds that the debtors have not maximized their income.  While the Court understands the debtors' desire for Gretchen to stay home until their youngest child is older, Gretchen could

---

[20]  This factor is inapplicable to Martin as he abandoned the pursuit of a criminal justice degree and has never sought employment in that field.

potentially supplement the family's income now by cleaning houses, as she testified that she cleans homes on occasion in lieu of paying the debtors' mortgage, with no apparent detriment to her ability to care for her children.

**Conclusion**

The burden of proving undue hardship under § 523(a)(8) is "rigorous." *In re Jesperson*, 571 F.3d at 779; *see Hurst v. S. Ark. Univ. et al.* (*In re Hurst*), No. 15-6031, 2016 WL 3902659 (B.A.P. 8th Cir. July 19, 2016) (affirming bankruptcy court's ruling that sixty-six-year-old debtor's student loan debt was nondischargeable despite debtor being four years away from retirement and suffering from vision, hearing, and ankle problems). Based upon the totality of the circumstances and for the reasons stated above, the Court finds that while the payment of the debtors' student loan obligations might be a hardship, it does not impose an *undue* hardship upon the debtors or their dependents. Therefore, the Court finds that the debtors' student loans are nondischargeable. The Court will enter a separate judgment in accordance with this order.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:   08/03/2016

cc:        Martin and Gretchen Young, debtors
            Forrest L. Stolzer, attorney for the debtors
            Deborah J. Groom, attorney for DOE
            Chapter 7 trustee
            United States Trustee

# Notice Recipients

District/Off: 0861−5                    User: annette                    Date Created: 8/3/2016
Case: 5:15−ap−07091                     Form ID: pdf08Ac                  Total: 7

**Recipients of Notice of Electronic Filing:**
ust       U.S. Trustee (ust)          USTPRegion13.LR.ECF@usdoj.gov
aty       Deborah J. Groom            debbie.groom@usdoj.gov
aty       Forrest L. Stolzer          fstolzer@wayneyounglaw.com

TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
pla       Martin L Young          259 N Center St        Elkins, AR 72727
pla       Gretchen J Young         259 N Center St        Elkins, AR 72727
dft       United States Department of Education        c/o Arne Duncan, Secretary of Education        400 Maryland Avenue,
          SW        Washington, DC 20202
intp      William M. Clark, Jr.        CYPERT, CROUCH, CLARK & HARWELL        PO Box 1400        Springdale, AR
          72765−1400

TOTAL: 4